In re Jody L. SEXTON, Debtor.

John A. Palik, Plaintiff,

v.

Jody L. Sexton, Defendant.

Bankruptcy No. 04–43154.
Adversary No. 04–4214.

United States Bankruptcy Court,
N.D. Ohio.

May 30, 2006.

---

John A. Hollister, Warren, OH, for Debtor/Defendant.

Amy L. Arrighi, Stacey A. O'Stafy, Strachan Miller Olender & Roessler, Toledo, OH, for Plaintiff.

## MEMORANDUM OPINION

KAY WOODS, Bankruptcy Judge.

This matter is before the Court upon the Motion for Summary Judgment of Plaintiff John A. Palik ("Plaintiff") filed on December 30, 2005. On February 8, 2006, with leave of Court, Debtor/Defendant Jody L. Sexton ("Debtor/Defendant") filed her Opposition Brief to the Motion for Summary Judgment.

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The following constitutes the Court's findings of fact and conclusions of law pursuant to FED. R. BANKR.P. 7052.

In his Complaint to Determine Dischargeability of Debt, Plaintiff, who is Debtor/Defendant's former spouse, alleges that certain debts arise out of or relate to willful and malicious injury to Plaintiff and his property, and, therefore, are nondischargeable pursuant to 11 U.S.C. § 523(A)(6). The debts in question arise from a Judgment Entry—Decree of Divorce Minor Child Issue ("Divorce Decree" or "J.E."), issued by the Honorable Jerry L. Hayes and dated September 1, 2000 in Case No. 98 DR 700 in the Portage County Court of Common Pleas, Domestic Relations Division, *John A. Palik v. Jody L. Palik* (the "Domestic Relations Case").

In his Motion for Summary Judgment, Plaintiff contends that the material ele-

ments of his dischargeability claim, including Debtor/Defendant's intent to cause injury to Plaintiff and his property, were actually litigated in the Domestic Relations Case, and, consequently, Debtor/Defendant is collaterally estopped from relitigating the elements of his nondischargeability claim in the bankruptcy court. In the alternative, Plaintiff argues that no genuine issue of fact exists with respect to the material elements of his nondischargeability claim.

## I. FACTS

The events which gave rise to the debts at issue in this case occurred on September 29, 1998,[1] and were the subject of a final hearing before Magistrate Richard Badger on January 14, 2000 ("the January 14th hearing"), as a part of the parties' divorce proceedings. See generally Excerpts of Transcript of January 14th Hearing ("Tr."). The following facts are taken from the January 14th hearing unless otherwise noted.

According to Debtor/Defendant's testimony, she spent a few days prior to September 29, 1998 at her parents' house because she needed to "get away." (Tr. at 131.) She returned to the marital residence on September 29, 1998, accompanied by her minor son from a previous marriage ("Karl"), to collect her personal belongings. (Tr. at 131.) When she and Karl attempted to enter the residence, they discovered that Plaintiff had changed the locks, so Debtor/ Defendant employed a sledgehammer to gain entry. (Tr. at 135.)

Once inside the marital residence, Debtor/Defendant took personal property belonging to her and her children, as well as Plaintiff's computer, some of his Christmas decorations, and his safe. (Tr. at 62.) The computer and the Christmas decorations were returned to Plaintiff without incident. (Tr. at 62.)

In her sole admission of intentional misconduct, Debtor/ Defendant conceded that she took Plaintiff's safe, but explained that she did so because she believed that the safe contained Plaintiff's coin collection. (Tr. at 132.) According to Debtor/ Defendant, she was not able "to get into the safe," but she had been told that there were coins in it. (Tr. at 132.) Debtor/Defendant testified that she took the safe "as ransom," because she was convinced at the time that Plaintiff had fraudulently attributed $85,000 of income to her on a Form 1099 submitted on behalf of his business. (Tr. at 132, 161–63.) She further testified that she planned to use the safe as leverage in order to compel Plaintiff to pay the taxes on the income fraudulently reported to her on the Form 1099. (Tr. at 132.)

According to Plaintiff's testimony, he "rushed home" on September 29, 1998 in response to a frantic telephone call from his daughter from a previous marriage ("Megan"), who told him that the marital residence had been burglarized. (Tr. at 57–58.) Upon his arrival, he found the front yard littered with trash and personal belongings, including two mattresses. (Tr. at 59.)

Plaintiff recognized almost immediately that Debtor/ Defendant was responsible

---

1. Debtor/Defendant testified at the final hearing before Magistrate Richard Badger on January 14, 2000 that the events occurred on September 27, 1998. (Tr. at 131.) In her affidavit, dated January 6, 2006, Debtor/Defendant states that the events actually occurred on September 29, 1998. (Affidavit of Jody Sexton, hereafter "Sexton Aff.," ¶ 4.) At the hearing, both parties testified that the events occurred on a weekday. Because September 27, 1998 was a Sunday and September 29, 1998 was a Tuesday, the Court accepts Plaintiff's later testimony.

for the state of the marital residence, because he noticed that most of her property had been removed. (Tr. at 58.) However, he testified that a lot of other property had been taken as well. (Tr. at 58.)

Plaintiff further testified that everything on the buffet in the dining room and in the kitchen and eating area had been smashed or thrown to the floor. (Tr. at 63–65.) For purposes of the hearing, Plaintiff prepared a list of personal property items and their values, captioned "List of Divorce Decree as Exhibit 1A" ("Exhibit 1A"). (Tr. at 60.)

Plaintiff testified that Megan's room had been specifically targeted. Megan's clothes had been sprayed with bathroom chemicals and her clarinet and alarm clock were damaged. (Tr. at 63–64.) A note was left in Megan's room, which read, "This is what you get when you mess with the best." (Tr. at 64.) Plaintiff conceded that the note appeared to be written by Karl, not Debtor/Defendant. (Tr. at 64.) Finally, Plaintiff testified that butter and other food products from the refrigerator had been melted and thrown on the walls and ceiling of the house. (Tr. at 65.)

At the January 14th hearing, Debtor/Defendant attempted to justify some of the disarray, and, in some instances, deflect responsibility for it. For instance, Debtor/Defendant explained that she was forced by circumstance to leave the two mattresses in the front yard, because they did not fit in the U–Haul truck. (Tr. at 135.) She further explained that it was Karl who had wrapped cassette tapes around the trees. (Tr. at 135.)

However, Debtor/Defendant was unwilling to assign responsibility at the January 14th hearing for the vandalism to Megan's room and belongings. She stated that Megan's room "was never gone into, as far as [she] knew," and that the room "looked exactly like it usually did." (Tr. at 136.)

Furthermore, although Debtor/Defendant conceded that Karl left the note, she denied any knowledge of the existence of the note on September 29, 1998. (Tr. at 136.)

When asked whether there was butter on the walls, she responded, "I guess that's what it was. I heard that had happened, yeah." (Tr. at 136.) When asked whether the photographs of the residence accurately depicted its appearance on September 29, 1998, Debtor/Defendant answered, "Yeah, somewhat." (Tr. at 136.) Finally, when directly confronted about the missing property, Debtor/Defendant provided a qualified denial of wrongdoing:

Q: Is it your testimony today, under oath, in front of this Magistrate, that you didn't take any antiques from that house?

A: When you say "antiques"—I mean, there are some things that are mine that are antiques, there's some things that are [Debtor/Defendant and Plaintiff's daughter] Elizabeth's—I mean, he might say others so—

Q: I am talking about property that John brought into the relationship.

A: Not that I can think of, no.

Q: So if [Plaintiff] testified that when he left for work that day, [if property] was there, you told us you broke in, and then when he came, it was gone, is it still your testimony that you didn't take that property?

A: I don't know what property you are talking about. You will have to be more specific.

Q: Well, did you see the list of property?

A: Yeah. Some of it's valid, some of it's not. I mean, there's a lot of my things. I have pages of premarital and marital items that I don't have either and we

are talking a bunch of money. I don't even care, I really don't.

(Tr. at 137–38.)

During Debtor/Defendant's testimony about the safe and its contents, the Court asked, "Did you take any of the coins?" Debtor/Defendant responded, "They are in the safe, as far as I know. That's what I was told." (Tr. at 161.) The Court then asked, "Are the coins in the safe?" (Tr. at 161.) Although it is not absolutely clear from the transcript, Magistrate Badger appeared to be addressing Plaintiff at counsel table.

Plaintiff responded that the coins were not in the safe. (Tr. at 161.) He explained that the safe contained a gun and ammunition, and that the safe's contents were listed in a police report filed after the September 29, 1998 incident. (Tr. at 161–62.) From the witness stand, Debtor/Defendant interjected, "Oh, I didn't know," after Plaintiff's statement about the gun and ammunition. (Tr. at 161.) However, shortly thereafter, she accused Plaintiff of lying about the safe's contents. (Tr. at 162.)

Despite Plaintiff's testimony about the contents of the safe, Plaintiff still asserted at the January 14th hearing that Debtor/Defendant took the coin collection. (Tr. at 61.) Specifically, Plaintiff alleged, "There were some remnants of [the coin collection in the upstairs bedroom closet], but the bulk of the coin collection, the main books containing the—containing the—most of the better coins were gone," (Tr. at 61), and "most of [the coin collection] was taken … they left 3 or $4,000 worth of silver scattered on the floor." (Tr. at 162.)

At the end of the hearing, Magistrate Badger instructed the parties to arrange a meeting where an independent party could conduct an inventory of the safe. (Tr. at 197.) The parties agreed to meet at the local police station on Tuesday of the following week and counsel for the parties agreed to submit a report on the contents of the safe to the Court the day after the safe was opened. (Tr. at 199.) However, the uncontroverted evidence before this Court establishes that the parties did not inventory the safe during the more than seven months between the hearing and the issuance of the Divorce Decree.[2]

After considering the testimony at the January 14th hearing, Judge Hayes made the following findings of fact and conclusion of law with respect to the property listed in Exhibit 1A:

The court finds that [Debtor/Defendant] forcefully entered the marital residence after the parties separated and removed or destroyed many of the household items including [Plaintiff's] coin collection. The value of the coin collection is $19,000.00. [Debtor/Defendant] is responsible for the coin collection, and must either return it to [Plaintiff] or pay to [Plaintiff] its value of $19,000.00 within 30 days. If said collection is not returned within 30 days, then [Plaintiff] is granted judgment against [Debtor/Defendant] for $19,000.00 plus 10% interest. Those other items that have been taken or destroyed and as set forth in Exhibit 1A attached hereto and not accounted for or returned by [Debtor/Defendant], are the responsibility of [Debtor/Defendant] and are a debt of [Debtor/Defendant] to [Plaintiff]. The

---

**2.** Debtor/Defendant states that the safe was opened on November 21, 2002, and that the safe contained a .22 pistol and ammunition. (Sexton Aff. ¶¶ 16–17.) The Court relies on the testimony in Debtor/Defendant's affidavit for the sole purpose of establishing that no report was provided to the Court regarding the contents of the safe prior to or after the issuance of the Divorce Decree.

Court specifically reserves jurisdiction to enforce this provision.

(J.E. at 9) ("the Exhibit 1A provision").

## II. STANDARD OF REVIEW

The procedure for granting summary judgment is found in FED.R.CIV.P. 56(c), made applicable to this proceeding through FED. R. BANKR.P. 7056, which provides in part that:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FED. R. BANKR.P. 7056(c). Summary judgment is proper if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it could affect the determination of the underlying action. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Tennessee Department of Mental Health & Retardation v. Paul B.,* 88 F.3d 1466, 1472 (6th Cir.1996). An issue of material fact is genuine if a rational fact-finder could find in favor of either party on the issue. *Anderson,* 477 U.S. at 248–49, 106 S.Ct. 2505; *SPC Plastics Corp. v. Griffith (In re Structurlite Plastics Corp.),* 224 B.R. 27 (6th Cir. BAP 1998). Thus, summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

In a motion for summary judgment, the movant bears the initial burden to establish an absence of evidence to support the nonmoving party's case. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Gibson v. Gibson (In re Gibson),* 219 B.R. 195, 198 (6th Cir. BAP 1998). The burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 590, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, in responding to a proper motion for summary judgment, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1476 (6th Cir.1989) (*quoting Anderson,* 477 U.S. at 257, 106 S.Ct. 2505). That is, the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact. *Street,* 886 F.2d at 1479.

## III. LAW

### A. Dischargeability

Section 523(a) of the Bankruptcy Code provides for a series of exceptions to the dischargeability of certain debts. For purposes of the case *sub judice,* § 523(a)(6) provides as follows:

> (a) A discharge under Section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> &ast; &ast; &ast;
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

11 U.S.C. § 523 (West 2006).

▬ Plaintiff bears the burden of proving by a preponderance of the evi-

dence that a debt is excepted from discharge under section 523(a) of the Bankruptcy Code. *Meyers v. I.R.S. (In re Meyers),* 196 F.3d 622, 624 (6th Cir.1999) (*citing Grogan v. Garner,* 498 U.S. 279, 290–91, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991)). Exceptions to discharge are narrowly construed "to promote the central purpose of discharge: relief for the 'honest but unfortunate debtor.'" *Id.* (*quoting Grogan,* 498 U.S. at 286–87, 111 S.Ct. at 654).

■ The Supreme Court has held that only acts done with intent to cause injury, and not merely acts done intentionally, rise to the level of willful and malicious injury for the purposes of satisfying section 523(a)(6). *Kawaauhau v. Geiger,* 523 U.S. 57, 57–58, 118 S.Ct. 974, 975, 140 L.Ed.2d 90 (1998) (hereafter cited as *"Geiger"*). In *Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455 (6th Cir.1999), the Sixth Circuit expanded the definition of "willfulness" to include the debtor's subjective belief that the injury is "substantially certain to result" from his actions. *Id.* at 464. A person acts maliciously when that person acts in conscious disregard of his or her duties or without just cause or excuse. *See Heyne v. Heyne (In re Heyne),* 277 B.R. 364, 368 (Bankr. N.D.Ohio 2002) (*citing Murray v. Wilcox (In re Wilcox),* 229 B.R. 411, 419 (Bankr. N.D.Ohio 1998)).

■ As the requirements of the statute are set forth in the conjunctive, a creditor must establish both willfulness and malice in order to prevail in a section 523(a)(6) action. However, at least one bankruptcy court in this district has recognized that "[b]ased upon a fair reading of [the] definition [of malice], it is logical to assume that in the great majority of cases, the same factual events giving rise to a finding of 'willful' conduct, will likewise be indicative as to whether the debtor acted with mal-

ice." *Superior Metal Products v. Martin (In re Martin),* 321 B.R. 437, 442 (Bankr. N.D.Ohio 2004).

■ Hence, in order to prevail in this 11 U.S.C. § 523(a)(6) action, Plaintiff must establish that: (1) Debtor/Defendant caused injury to Plaintiff or his property; (2) Debtor/Defendant intended to cause the injury or that such injury was substantially certain to occur as a result of Debtor/Defendant's actions; and (3) Debtor/Defendant acted in conscious disregard of her duties or without just cause or excuse.

### B. Collateral Estoppel

According to Plaintiff, the material elements of his section 523(a)(6) claim, that is, injury, willfulness, and malice, were already litigated in the Domestic Relations Case. As a result, Plaintiff asserts that Debtor/Defendant is collaterally estopped from "relitigating" those issues in the bankruptcy court.

■ Generally, the doctrine of collateral estoppel "precludes relitigation of issues of fact or law actually litigated and decided in a prior action between the same parties and necessary to the judgment, even if decided as part of a different claim or cause of action." *Markowitz,* 190 F.3d at 461 (*quoting Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 480 (6th Cir.1992)). More specifically, collateral estoppel, or "issue preclusion," will apply where: (1) the law of collateral estoppel in the state in which the issue was litigated would preclude relitigation of such issue, and (2) the issue was fully and fairly litigated in state court. *Markowitz,* 190 F.3d at 461 (*citing* 28 U.S.C. § 1738).

■ In Ohio, the following elements must be established to apply the doctrine of collateral estoppel: 1) A final judgment on the merits in the previous case after a

full and fair opportunity to litigate the issue; 2) The issue must have been actually and directly litigated in the prior suit and must have been necessary to the final judgment; 3) The issue in the present suit must have been identical to the issue in the prior suit; and 4) The party against whom estoppel is sought was a party or in privity with a party to the prior action. *Gonzalez v. Moffitt (In re Moffitt)*, 252 B.R. 916, 921 (6th Cir. BAP 2000).

■ The United States Supreme Court has held that the doctrine of collateral estoppel is applicable in bankruptcy proceedings. *See Grogan*, 498 U.S. at 284, 111 S.Ct. at 658. "[T]he party asserting preclusion bears the burden of proof." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrecoverable Trust Dated June 27, 2002*, 410 F.3d 304, 310 (6th Cir.2005) (*quoting United States v. Dominguez*, 359 F.3d 839, 842 (6th Cir.), *cert. denied*, 543 U.S. 848, 125 S.Ct. 261, 160 L.Ed.2d 78 (2004)).

Courts in this circuit have had a number of occasions, post-*Geiger, supra*, to determine whether judgments entered in prior state court proceedings require the application of collateral estoppel to the issue of willful and malicious intent in section 523(a)(6) actions.

Both trial and appellate courts have applied the doctrine of collateral estoppel to prevent a debtor from relitigating the issue of his or her intent to cause injury where the debtor has previously been found liable for defamation *per se, Kennedy v. Mustaine (In re Kennedy)*, 249 F.3d 576, 582 (6th Cir.2001); breach of a covenant not to compete, breach of the duty of loyalty, misappropriation of trade secrets, interference with business relations, *Spring Works v. Sarff (In re Sarff)*, 242 B.R. 620, 627 (6th Cir. BAP 2000); and intentional infliction of emotional distress, *In re Moffitt*, 252 B.R. at 923.

Similarly, the bankruptcy court in *Heyne, supra*, found that a debt, which was incurred by the debtor as a sanction for his repeated violation of a contempt order issued by Probate Court, was non-dischargeable pursuant to section 523(a)(6). The Court reasoned that "a finding of contempt—which at the very least requires that the alleged contemptor must have knowingly disobeyed the underlying order—lends itself to a finding of deliberate and intentional act." *Heyne*, 277 B.R. at 369.

On the other hand, at least two courts in this circuit have recognized that the issue of willful and malicious intent is not actually litigated in a malpractice action. *Kowalski v. Romano (In re Romano)*, 59 Fed. Appx. 709, 715 (6th Cir.2003); *see also Markowitz*, 190 F.3d at 462 ("[T]he jury's finding that [the attorney] acted with knowledge of a high probability of harm to his clients does not collaterally estop him from claiming that his action did not constitute a willful and malicious injury.").

■ Consequently, it is only when the debtor's intent to cause the injury in question was a material element of the prior court judgment that courts in this circuit have applied the doctrine of collateral estoppel. With the foregoing case law in mind, the Court turns to the specific issues presented by this case.

## IV. ANALYSIS

### A. Evidentiary Issues

Plaintiff relies on the Divorce Decree, excerpts from the transcript of the January 14th hearing, an unreported case from this Court, and his own affidavit, dated December 28, 2005, in support of his Motion for Summary Judgment. Debtor/Defendant relies exclusively on her own affi-

davit, dated January 6, 2006, in support of her Opposition Brief.[3]

This Court must rely solely upon the testimony provided at the January 14th hearing and Judge Hayes's findings of fact and conclusions of law in the Divorce Decree in order to determine whether the material elements of Plaintiff's section 523(a)(6) claim were actually and directly litigated in the domestic relations court and were necessary to that final judgment. Therefore, in resolving the collateral estoppel issue, this Court cannot consider the statements in the parties' respective affidavits to the extent that they supplement or contradict the testimony provided at the January 14th hearing.

However, in the event that the Court concludes that Debtor/Defendant is not collaterally estopped from litigating the alleged injury to Plaintiff and his property or her intent on September 29, 1998, the Court will consider the statements in both affidavits in order to determine whether genuine issues of fact exist with respect to the merits of this case.

## B. Collateral Estoppel

In order to successfully assert the doctrine of collateral estoppel, Plaintiff must demonstrate that the four requirements for preclusion recognized in Ohio are present with respect to each of the material elements of his dischargeability claim. Obviously, the parties in the Domestic Relations Case are the same parties in the case *sub judice*. Consequently, the fourth element, identity or privity of parties, is established in this case without the need for evidence or argument.

### 1. Final Judgment

▮ Plaintiff contends that the Divorce Decree is a final judgment on the merits in the Domestic Relations Case, and that the parties had a full and fair opportunity in the domestic relations court to litigate the material issues of his dischargeability claim.

Debtor/Defendant argues, however, that the Divorce Decree is not a "final judgment" because Judge Hayes reserved jurisdiction to enforce the Exhibit 1A provision. In her Opposition Brief, Debtor/Defendant characterizes the Divorce Decree as "a provisional or contingent decision, one that the domestic relations court expected to revisit and as to which it contemplated further proceedings and thus further findings of fact." (Opposition Brief at 4.) ("Opp.Br.") Debtor/Defendant cites no legal authority for this conclusion.

In Ohio, "the entire concept of 'final orders' is based upon the rationale that the court making an order which is not final is thereby retaining jurisdiction for further proceedings. A final order, therefore, is one disposing of the whole case or some separate and distinct branch thereof." *Lantsberry v. Tilley Lamp Co.* (1971), 27 Ohio St.2d 303, 306, 272 N.E.2d 127, 129. More specifically, at least one appellate court in Ohio has held that a divorce decree is not final pursuant to Ohio Rule of Civil Procedure 54(B) when the court has disposed of fewer than all of the issues in the divorce. *Isaacson v. Isaacson* 2002 WL 252390, *1 (Ohio App. 6 Dist., 2002).

Here, all of the issues raised in the divorce proceedings were disposed of in the Divorce Decree, including Debtor/De-

---

**3.** Because Debtor/Defendant chose to rely solely upon her January 6, 2006 affidavit, rather than submitting portions of the transcript of the January 14th hearing in support of her Opposition Brief, the Court's review of

the testimony provided at the January 14th hearing is limited to those portions of the transcript submitted by Plaintiff in support of his Motion for Summary Judgment.

fendant's liability for the removal or destruction of the property listed in Exhibit 1A. Judge Hayes did not reserve jurisdiction to revisit any substantive issue (*i.e.* alimony, child support, property division) presented in the Domestic Relations Case.

As a matter of fact, the plain language of the Divorce Decree establishes that Judge Hayes reserved jurisdiction solely to *enforce* the Exhibit 1A provision, not to conduct additional fact finding regarding the events of September 29, 1998.[4] Indeed, the sole issue to be determined by the domestic relations court pursuant to Judge Hayes' reservation of jurisdiction was whether Debtor/Defendant returned the property listed in Exhibit 1A or paid the value of the property to Plaintiff within thirty days of the issuance of the Divorce Decree.

The factual finding that Debtor/Defendant took the property and the legal conclusion that she was liable to Plaintiff for the property or its value were final. Only the execution of judgment against Debtor/Defendant was contingent upon the opportunity provided to her in the Divorce Decree, *i.e.*, to return the property or to pay its value to Plaintiff within 30 days. Consequently, the mere fact that Judge Hayes gave Debtor/Defendant a final chance to avoid the entry of judgment against her does not manifest any intention on his part to conduct additional proceedings and make further findings of fact.

■ Even assuming, *arguendo*, that the Divorce Decree was a contingent order on the date it was issued, the contingency

upon which the "continuing jurisdiction" of Judge Hayes was premised expired thirty days after the issuance of the Divorce Decree. In other words, even if the Divorce Decree was not a final judgment on September 1, 2000, it was a final judgment on October 1, 2000.

In summary, the Divorce Decree disposed of all of the issues in the divorce proceedings, including Debtor/Defendant's liability for the removal or destruction of the property listed in Exhibit 1A on September 29, 1998. Furthermore, Judge Hayes clearly reserved jurisdiction in the Divorce Decree for the sole purpose of enforcing the Exhibit 1A provision. Because Debtor/Defendant's characterization of the Divorce Decree as "provisional" or "contingent" is inconsistent with both state law and the plain language of the Divorce Decree, the Divorce Decree is a "final judgment" as that term has been defined in Ohio.

### 2. Actual and Direct Litigation of Identical Issues

#### a. Injury to Plaintiff and his Property

■ Plaintiff next asserts that issues which are identical to the material elements of his dischargeability claim were actually and directly litigated in the Domestic Relations Case, and were necessary to the final judgment. *See Moffitt, supra.*

With respect to the first material element of Plaintiff's dischargeability claim, *i.e.*, injury to Plaintiff and his property, Debtor/Defendant argues that the terms of the Divorce Decree do not collaterally estop her from litigating: (1) whether she

4. In the Divorce Decree, Judge Hayes unequivocally concludes that Debtor/ Defendant "removed or destroyed many of the household items including [Plaintiff's] coin collection," and grants Debtor/Defendant thirty days to return the coin collection or pay its value to Plaintiff. (J.E. at 9.) With similar decisiveness, Judge Hayes concludes

that "other items that have been taken or destroyed and as set forth in Exhibit 1A attached hereto and not accounted for or returned by [Debtor/Defendant] are the responsibility of [Debtor/ Defendant] and are a debt of [Debtor/Defendant] to [Plaintiff]." (J.E. at 9.)

took Plaintiff's coin collection; and (2) the nature and value of the property listed in Exhibit 1A.

First, Debtor/Defendant contends that Judge Hayes' conclusion that she took the coin collection was based upon a material mistake of fact, that is, the Court's misapprehension that the coin collection was in the safe. (Opp. Br. at 7.) ("Thus by [the domestic relations court] and by [Debtor/Defendant], return of the safe was anticipated to be equal to, and therefore to satisfy the requirement of, return to [Plaintiff] of his coins.")

In order to convince this Court that Judge Hayes believed the coin collection was in the safe, Debtor/Defendant struggles to diminish the effect of the colloquy between Plaintiff and Magistrate Badger about the contents of the safe. (Opp. Br. at 7–8.) ("Even [Plaintiff] only adverted to [the contents of the safe] in a single interjection from the body of the court, when he was not himself testifying, so it is understandable that the court, in summing up what had taken place during the hearing, failed to recall or note [Plaintiff's] sole comment from the counsel table, earlier in the day while [Debtor/Defendant] was testifying . . . .").

Debtor/Defendant's arguments fail under the slightest scrutiny. First, the "single interjection" about the contents of the safe by Plaintiff was made in response to a direct question from Magistrate Badger. Second, Magistrate Badger did not "fail[ ] to recall or note" Plaintiff's statement about the safe's contents: At the close of the January 14th hearing, Magistrate Badger indicated his intent to enter an order directing the parties to open the safe (Tr. at 195–96), but the parties agreed to do so without such an order. (Tr. at 197.)

Simply stated, there is no reference to the safe or its contents in the Divorce Decree, or, for that matter, any suggestion

that Judge Hayes' ruling rested upon the mistaken belief that the coin collection was in the safe. As a matter of fact, based upon the conflicting testimony provided at the January 14th hearing about the contents of the safe, it is apparent that Judge Hayes rejected Debtor/Defendant's testimony that she believed that the coin collection was in the safe.

Even if Debtor/Defendant could demonstrate that Judge Hayes' legal conclusions were premised upon a mistake of fact, she cannot challenge his legal conclusions in this Court. Debtor/ Defendant had ample opportunity to appeal the Divorce Decree through the state court appellate process. Her decision not to appeal the Divorce Decree was undertaken at her own peril.

Finally, contrary to Debtor/Defendant's argument, the fact that Judge Hayes reserved jurisdiction to enforce the Exhibit 1A provision of the Divorce Decree does not taint his ultimate conclusion that she took the coin collection. As stated earlier, Judge Hayes did not reserve jurisdiction to receive additional evidence about the contents of the safe, he reserved jurisdiction to permit Debtor/Defendant to return the property in Exhibit 1A or pay the value of the property to Plaintiff, and in so doing, avoid the automatic entry of judgment against her.

Accordingly, the Divorce Decree, read in conjunction with the evidence adduced at the January 14th hearing, supports one conclusion: Judge Hayes rejected Debtor/Defendant's testimony regarding the safe's contents and still concluded that she took the coin collection. Furthermore, Judge Hayes' reservation of jurisdiction to enforce Exhibit 1A does not reveal that his decision about the coin collection was premised upon the mistaken belief that the coin collection was in the safe.

Next, Debtor/Defendant contends that the domestic relations court "[made] no determination about whether the 'household items' removed were [Debtor/Defendant's] separate property or not, and, indeed, except for the [computer and the Christmas decorations] accidentally mixed up with her and her children's furniture and clothes, and except for the safe which she believed (erroneously, as it turned out) to contain the coin collection, all of the items she removed were her own." (Opp. Br. at 4 (*citing* Sexton Aff. ¶¶ 4, 7, 8, 9, and 11.).)

To the contrary, Judge Hayes not only made a specific reference to the property listed in Exhibit 1A, but actually attached Exhibit 1A to the Divorce Decree. In fact, Exhibit 1A identifies the missing or destroyed property, estimates its value, and classifies each individual item as "marital" or "separate" property. Again, Debtor/Defendant's opportunity to challenge Judge Hayes' findings regarding the evidence contained in Exhibit 1A was in state court. Because Debtor/Defendant's efforts to get a "second bite at the apple" with respect to the nature and value of property listed in Exhibit 1A, like her attempt to relitigate the issues surrounding the coin collection, violate the very essence of the doctrine of collateral estoppel, those efforts will not be sanctioned by this Court.

Accordingly, because identical issues before this Court, that is, injury to Plaintiff and his property and the specific nature and value of that property, were actually and directly litigated in the Domestic Relations Case and were necessary to the final judgment entered in that case, Plaintiff is collaterally estopped from arguing: (1)

that she took or destroyed the property listed in Exhibit 1A, including Plaintiff's coin collection; (2) the nature of the property; and (3) the value of the property.

**b. Willfulness and Malice**

■ Plaintiff asserts, in his Brief in Support of Summary Judgment, that "although [Debtor/Defendant's] actions were not specifically characterized by [the domestic relations court] as willful and malicious, such characterization is not necessary because the Divorce Decree based upon the testimony of the parties taken at the [January 14th hearing] is sufficient to warrant an interpretation that [Debtor/Defendant's] conduct was in fact willful and malicious." (Brief in Support at 11.) ("Br.")

In support of the foregoing conclusion, Plaintiff argues that this Court's decision in *Mullen v. Mann (In re Mann)*, Case No. 03-4089 (N.D.Ohio, September 30, 2004), is "directly on point" with the issues presented in this case. (Br. at 11.) Plaintiff further argues that the facts in this case are analogous to the facts in *Heyne v. Heyne, supra,* and, therefore, the holding in that case is persuasive authority. However, an examination of the cases cited by Plaintiff reveals that they are both distinguishable from the case *sub judice.*

In *Mullen v. Mann,* Mann acquired a fraudulent power of attorney and used it to convert property owned by Charles H. Bolyard to his own use. *Mann* Op. at 2. Mullen, the executrix of Bolyard's estate, filed a complaint pursuant to R.C. § 2109.50[5] in the Mahoning County Probate Court to recover the converted property. In its judgment entry, the Probate Court concluded that Mann "was guilty of concealing and having been in possession

5. R.C. § 2109.50 authorizes a county probate court to compel "a person suspected of having concealed, embezzled, or conveyed away or of being or having been in the possession of any moneys, chattels, or choses in action of such estate" to appear and be examined by the court. *See* OHIO REVISED CODE ANN. § 2109.50 (West 2006).

of assets of the trust estate," in violation of R.C. § 2109.50, and awarded money damages to Mullen. *Id.* at 4–5.

After Mann filed his petition in this Court, Mullen filed an adversary proceeding challenging the dischargeability of the damage award pursuant to 11 U.S.C. § 523(a)(2)(A), which prohibits the discharge of debts for money obtained by false pretenses or a false representation.

In analyzing the Probate Court's ruling as it applied to Mann's intent, this Court first recognized the rule of law in Ohio regarding *scienter* in R.C. § 2109.50 actions established in *In re Estate of Popp,* 94 Ohio App.3d 640, 641 N.E.2d 739 (8th Dist.1994). In that case, the Eighth District Court of Appeals concluded that *scienter* is not a necessary element of an R.C. § 2109.50 claim. *See Popp,* 94 Ohio App.3d at 647, 641 N.E.2d at 743–44 ("[I]n a proceeding against a financial institution under R.C. § 2109.50 ... it is not necessary to establish that the conveyance was made with fraudulent or criminal intent.").

Cognizant of the holding in *Popp,* this Court concluded that "[a]lthough the Probate Court was not required to and did not make a specific finding of *scienter* or criminal intent by [Mann], there is enough in the Judgment Entry to warrant an interpretation that [Mann's] concealment and possession of the estate's assets was wrongful and done under false pretenses." *Mann* Op. at 5–6. This Court premised its finding of nondischargeability on the Probate Court's use of the phrase "guilty of concealing," which, according to this Court, "connote[d] a wrongful and intentional action to defraud." *Id.* at 5.

In the above-captioned case, Judge Hayes ruled solely upon the commission of the acts by Debtor/Defendant, he did not adjudge her consciousness on September 29, 1998. In other words, although Judge Hayes concluded that Debtor/Defendant "removed or destroyed" the marital property at issue, he did not render any judgment on her culpability in committing those acts. As such, this Court's holding in *Mann* is inapposite to the facts in the current case.

Equally unavailing to Plaintiff is the rule of law announced in *Heyne v. Heyne, supra.* In that case, a restraining order was entered in the domestic relations case prohibiting Mr. Heyne from "acquiring possession or disposing of any property related to the [p]arties' farming related activities." *Heyne,* 277 B.R. at 366. In direct contravention of the restraining order, Mr. Heyne disposed of a significant amount of assets. *Id.*

As a result, the domestic relations court entered an order of contempt against Mr. Heyne, but gave him the opportunity to purge himself of the contempt by providing to the court a written accounting of the assets sold, along with a detailed accounting of the disposition of the proceeds. *Id.* In the contempt order, the Court again strictly prohibited Mr. Heyne from disposing of, or in any way altering, any of the Parties' assets. *Id.*

Despite the strongly-worded contempt order, Mr. Heyne continued to sell marital property without the permission of the Court. *Id.* As a consequence of Mr. Heyne's continuing violation of the contempt order, the domestic relations court entered judgment in the amount of $72,456.52 plus interest at the rate of 10% in favor of Mrs. Heyne and against Mr. Heyne in the parties' divorce decree. *Id.*

After Mr. Heyne filed his petition in bankruptcy court, Mrs. Heyne asserted that the judgment was nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2)(A), 523(a)(6), and 523(a)(15) (debts arising from a property settlement in a divorce or separation). The *Heyne* Court's analysis

centered on the third element of collateral estoppel, *i.e.,* that the issue in the present case must be identical to the issue involved in the prior suit. *Id.* at 368.

Because Mrs. Heyne had a legal interest in the marital assets sold by Mr. Heyne, the *Heyne* Court reasoned that "by disposing of the [p]arties' marital property in direct violation of the state court's orders, [Mr. Heyne] clearly committed the tort of conversion for the purposes of Ohio law." *Id.* Next, the Court recognized that, although an "innocent or technical" conversion of a person's property does not lend itself to a finding of a willful or malicious injury for dischargeability purposes, "the tort of conversion, if done deliberately and intentionally, will give rise to a nondischargeable debt." *Id.* at 368–69 (*citing Geiger,* 523 U.S. 57, 118 S.Ct. 974, 975, 977, 140 L.Ed.2d 90). Finally, the Court concluded that Mr. Heyne's conversion of the marital property was deliberate. *Id.* at 369, 118 S.Ct. 974.

The *Heyne* Court premised its conclusion that Mr. Heyne was precluded from relitigating his intent on the following facts: (1) the contempt order, which required a finding by the domestic relations court that Mr. Heyne knowingly disobeyed the underlying order; (2) Mr. Heyne's failure to rectify his wrongful disposition of marital property, despite ample opportunity to do so provided in the contempt order; (3) Mr. Heyne's failure to articulate to the state court any valid cause or excuse for his conversion; and (4) the sheer volume of marital property that Mr. Heyne converted over time. *Id.*

Plaintiff's reliance on the *Heyne* decision, like his reliance on the *Mann* decision, is misplaced. Admittedly, the facts in *Heyne* bear some resemblance to the facts in the current case. However, the *Heyne* Court gave considerable weight Mr. Heyne's knowing and repeated violation of

the contempt order. Indeed, the *Heyne* Court predicated its finding of deliberateness on the fact that Mr. Heyne "knowingly disobeyed" the contempt order. *Heyne,* 277 B.R. at 369.

Here, Debtor/Defendant's actions on September 29, 1998 did not violate any existing court order. In fact, testimony at the January 14th hearing suggested that Debtor/Defendant may have removed the property listed in Exhibit 1A under the mistaken assumption that it belonged to her or her children, or that she may have destroyed the property listed in Exhibit 1A accidentally. As such, this Court finds that the rule of law announced in *Heyne* does not govern the facts of this case.

Ultimately, the Divorce Decree in the case *sub judice* neither expressly states nor cryptically implies that Judge Hayes considered Debtor/Defendant's removal or destruction of the property in Exhibit 1A to be willful or malicious. Moreover, it is reasonable to conclude that Judge Hayes would have found Debtor/Defendant liable to Plaintiff for the missing or destroyed property or its value, even if she took the property under the mistaken belief that it belonged to her or if she destroyed the property accidentally. Therefore, it is inappropriate to infer from Judge Hayes' assignment of financial responsibility for the removed/destroyed property that he believed Debtor/Defendant acted willfully or maliciously on September 29, 1998.

Consequently, Debtor/Defendant's state of mind on September 29, 1998 was neither actually nor directly litigated by the domestic relations court, nor was it "necessary to the final judgment." As a consequence, Debtor/Defendant is not collaterally estopped from litigating whether her actions on September 29, 1998 were the result of her intent to injure Plaintiff or his property.

### 3. Genuine Issues of Material Fact

■ Notwithstanding this Court's pronouncement that Debtor/ Defendant may adduce additional evidence, *i.e.* her affidavit, to establish her state of mind on September 29, 1998, Plaintiff may still prevail on his Motion for Summary Judgment if he can demonstrate that no genuine issue of material fact exists regarding Debtor/Defendant's intent to cause injury to Plaintiff and his property.

In his Brief in Support, Plaintiff relies on a number of circumstances on September 29, 1998 to establish that Debtor/ Defendant willfully and maliciously removed or destroyed the property listed in Exhibit 1A:

(1) Debtor/Defendant used a sledgehammer to gain entrance into the house. (Br. at 8.) ("Given the existence of several less damaging alternatives for gaining entry to the home, including, without limitation, contacting [Plaintiff] or a locksmith, [Debtor/Defendant's] use of the sledgehammer was completely unreasonable.");

(2) Debtor/Defendant entered the premises when Plaintiff was not home. (Br. at 8.) ("The fact that [Debtor/Defendant] chose to retrieve her personal property from the marital residence at a time when she knew [Plaintiff] would be away from the home evidences her ulterior motive to commit wrongdoing.");

(3) Debtor/Defendant caused damage to the residence "as well as [Plaintiff's] belongings and to those of his daughter, Megan." (Br. at 8.);

(4) Debtor/Defendant admitted there was butter on the walls. (Br. at 9.); and

(5) Debtor/Defendant admitted to taking the safe. (Br. at 9.)

Based upon the foregoing evidence, Plaintiff concludes that Debtor/Defendant's ac-

tions "were undeniably both malicious and willful under the *Geiger* standard and must result in this Court determining that the [debts at issue in this case] are nondischargeable under 11 U.S.C. § 523(a)(6)." (Br. at 9.)

However, standing alone, the facts cited in Plaintiff's Brief in Support do not demonstrate that Debtor/Defendant intended to cause injury to Plaintiff and his property on September 29, 1998. In addition, Debtor/Defendant's affidavit, dated January 6, 2006, which may now be considered by this Court, provides additional evidence that further calls into doubt the legitimacy of Plaintiff's conclusion.

According to Debtor/Defendant, she went to the residence unannounced and during business hours on September 29, 1998 in order to avoid a confrontation with Plaintiff, who had been violent toward her in the past. (Sexton Aff. ¶ 5.)

She states that she did not know that food products had been thrown on the walls of the marital residence or that the marital residence had been vandalized on September 29, 1998, until she heard Plaintiff's testimony about the condition of the residence at the January 14th hearing. (Sexton Aff. ¶ 15.)

According to her affidavit, Debtor/Defendant questioned Karl after the January 14th hearing about the condition of the marital residence on September 29, 1998, and he admitted that he "[did] some things while [they] were back at our house" because he was very angry at Plaintiff. (Sexton Aff. ¶ 15.) Although Debtor/Defendant explains that she is not "precisely certain just what [Karl] may have done or where he may have done it," she attests that she never did any deliberate damage at the marital residence, nor did she authorize Karl to do any deliberate damage. (Sexton Aff. ¶ 15.)

Debtor/Defendant admits to knowingly taking Plaintiff's safe, but further states

that the safe and its contents were returned to Plaintiff on November 21, 2002 at a meeting she arranged in Newton Falls, Ohio. (Sexton Aff. ¶¶ 11, 17.)

As stated earlier, the condition of the marital residence, as chronicled in Plaintiff's Brief in Support, does not establish that Debtor/Defendant acted willfully or maliciously on September 29, 1998. Interestingly, even though Judge Hayes concluded that Debtor/Defendant removed or destroyed the property listed in Exhibit 1A, he did not hold Debtor/Defendant similarly responsible for the damage to the exterior doors or for the cost of cleaning the ceiling and walls. Moreover, the statements in Debtor/Defendant's affidavit create genuine issues of material fact with respect to both the timing of her visit to the marital residence and the level of Karl's involvement in the vandalism.

In conclusion, Debtor/Defendant could not avoid liability for the property listed in Exhibit 1A due to the mistaken removal or the accidental destruction of that property in the Domestic Relations Case. In other words, based upon the findings of fact in the Divorce Decree, the motivation underlying Debtor/Defendant's actions on September 29, 1998 was essentially irrelevant to Judge Hayes.

Here, Debtor/Defendant's state of mind is a material element of Plaintiff's nondischargeability claim. Plaintiff, in his Brief in Support, has failed to demonstrate that no genuine issue of material fact exists with respect to Debtor/Defendant's intent to cause injury to Plaintiff and his property. Accordingly, his Motion for Summary Judgment on the issue that Debtor/Defendant's actions on September 29, 1998 were both willful and malicious is denied.

## IV.   CONCLUSION

The Divorce Decree is a final order. Debtor/Defendant is collaterally estopped from relitigating the amount of the debt she owes to Plaintiff and her liability to Plaintiff, as set forth in the Divorce Decree. Debtor/Defendant is not collaterally estopped from litigating the issue of whether the conduct giving rise to the debt was willful and malicious. Based upon the evidence in support of and in opposition to summary judgment, there is a genuine issue of fact regarding whether Debtor/Defendant's conduct was willful and malicious. Since willfulness and malice are essential elements in a nondischargeability action under 11 U.S.C. § 523(a)(6), summary judgment in favor of Plaintiff is inappropriate and must be denied on that issue.

An appropriate order shall enter.

## ORDER GRANTING SUMMARY JUDGMENT, IN PART, AND DENYING, IN PART

For the reasons set forth in this Court's Memorandum Opinion entered this date, Plaintiff's Motion for Summary Judgment is granted, in part, and denied, in part. With respect to the application of doctrine of collateral estoppel to the material element of injury to Plaintiff and his property, Plaintiff's Motion for Summary Judgment is granted. With respect to the material element of Debtor/Defendant's intent to cause injury to Plaintiff and his property, Plaintiff's Motion for Summary Judgment is denied. As a result of this Court's ruling on the dispositive motion, it appears that this matter should be ready to proceed to trial. This Court sets a final pre-trial on the record for Wednesday, July 12, 2006, at 10:30 a.m. Counsel and clients are to be present.

**IT IS SO ORDERED.**